IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 7, 2011

## DONNA LEIGH PEARSON v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**Nos. 2009-D-3042 & 2009-D-3183     Cheryl Blackburn, Judge**

**No. M2011-00216-CCA-R3-PC - Filed March 23, 2012**

In two separate cases, the Petitioner, Donna Leigh Pearson, pled guilty to burglary and theft of over $1000. The trial court sentenced her to ten years on each count, to be served in the Tennessee Department of Correction at 45%, and, because the Petitioner committed one offense while released on bond for the other offense, the trial court ordered consecutive sentences. The Petitioner filed a petition for post-conviction relief, and the post-conviction court dismissed the petition but granted the Petitioner the opportunity to seek a delayed appeal of her sentence. On appeal, the Petitioner contends that: (1) she received the ineffective assistance of counsel; (2) her guilty pleas were not knowingly and voluntarily entered; and (3) the trial court erred when it sentenced her. After a thorough review of the record and applicable authorities, we affirm the post-conviction court's dismissal of her petition and we affirm her sentence.

**Tenn. R. App. P. 3 Appeal as of Right ; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., J., joined. THOMAS T. WOODALL, J., concurred in results only and filed a separate opinion.

Ryan C. Caldwell, Nashville, Tennessee, for the appellant, Donna Leigh Pearson.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Bret Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from two separate cases, one in which the Petitioner took and pawned the personal property of her brother after breaking into his home and one in which she took client records after breaking into her place of employment.

## A. Guilty Plea Hearing

The Petitioner pled guilty to one count of burglary and one count of theft of property valued at more than $1000, both Class D felonies. At the Petitioner's plea submission hearing, the parties agreed that the Petitioner was a Range III, persistent offender. The trial court noted that the sentencing range for each conviction was between eight and twelve years. It also noted that, because the Petitioner was on bond for one of the offenses when she committed the other offense, consecutive sentencing was mandatory. The trial court informed the Petitioner that her minimum sentence for both offenses was sixteen years and the maximum sentence was twenty-four years. The trial court further stated that the Petitioner could be eligible for community corrections if each of her sentences was ten years or less but that community corrections was not guaranteed. The trial court dismissed other charges against the Petitioner in accordance with her plea agreement with the State.

The Petitioner informed the trial court that her counsel ("Counsel") had discussed with her the charges she faced and her range of punishment. She agreed that Counsel had discussed with her that she would be sentenced consecutively. The Petitioner told the trial court that she had graduated from college and that she personally read her petition to enter the plea of guilty. She said she initialed the petition and that she had no questions regarding the petition. When the trial court asked the Petitioner if she was "satisfied with the work [Counsel] had done" on her case, the Petitioner responded, "Immensely." The trial court explained the Petitioner's rights to her and asked if she still wanted to plead guilty, and the Petitioner responded in the affirmative.

The State summarized the facts it would have proven had the case gone to trial, stating:

> In 2009-D-3183 the State's proof on that case would have been that on April 19th, 2009, the victim, Mr. William Pearson, who is the [Petitioner's] brother, came home to his residence here in Nashville, Davidson County and found that forced entry had been made, breaking out a dining room window. Several items, mostly jewelry, a gold nugget watch were taken from the residence. He suspected his sister and told the detective as [m]uch. The detective went to Cash America Pawn and found that the jewelry had been pawned for a total amount given of $610, and [the Petitioner] had used her Tennessee drivers license when pawning the jewelry. That was here in

Davidson County.

And then in 2009-D-3042, the State's proof would have been on – around midnight between May 12th and going on May 13th Dr. Rolin had his Rolin Hills Dental Care, when they showed up for business the next day, it had been burglarized. I believe a back window had been broken out, and there was even some blood smears found on the back door and other places. And at first they didn't determine what property was taken, but it was ultimately determined that some files were taken from the business. And [the Petitioner] she was on video, and Dr. Rolin recognized her as a person who had worked there in the past. And also [the Petitioner] confessed to such to the detective. This was also in Nashville[,] Davidson County.

The trial court inquired with the Petitioner if the State's summary was true, and the Petitioner responded, "Yes." The trial court then accepted the Petitioner's guilty pleas and found her guilty of theft of property valued over $1000 and burglary.

## B. Sentencing Hearing

In this appeal, the post-conviction court granted the Petitioner a "delayed appeal" of her sentence. At the Petitioner's sentencing hearing, the following occurred: the trial court first noted that the sentences were "[a]utomatically consecutive." The Petitioner, therefore, faced a sentence of between sixteen and twenty-four years.

Dr. Barry Rolin testified that he was a dentist and that he had his own practice in Goodlettsville, Tennessee. He identified the Petitioner as someone whom he once employed at his practice as a billing clerk. He explained that she would "fill in" when the dentist's office needed her, working for him "sporadically" until the burglary. Dr. Rolin recalled that the Petitioner had "some problems" as an employee. He was aware at the time he employed her that she was on dental board probation, but he said she seemed very interested in working for him. The Petitioner called the office repeatedly asking to work. The doctor and his staff, however, became suspicious that the Petitioner was working "under the influence" of "drugs or something," so they did not ask her to return.

Dr. Rolin testified about the burglary, saying that, on May 13, 2009, his accountant, who was also his cousin, called him after she had stopped by his office to check the mail. She informed Dr. Rolin that she had found the office in disarray. Dr. Rolin told his accountant to leave the building and then call the police. He then went to the office. When he arrived, he found that the window beside the door had been broken, some of the files "were strewn about," and the safe in the back office had been taken off of the desk and

thrown on the floor. It appeared that some kind of hard object had been used to beat the safe, damaging the dial to the point in which the safe could no longer be opened.

Dr. Rolin recalled that there was blood scattered around the office. He found some gloves discarded in the trash can. The doctor testified that he and his staff had to disinfect the entire office and that the repairs to the office totaled approximately $1500.

Dr. Rolin testified that his office was monitored by a security system, which included video cameras. He watched the video from the time of the burglary, which showed the burglar attempting to enter the dentist's office wearing a disguise. He said that the burglar attempted to beat down and then pry open the back door of the office. When that was unsuccessful, she broke through a window, cutting her hand in the process. The burglar then went into one of the rooms of the office and took off her disguise, revealing her identity as the Petitioner. The Petitioner attempted to get into the safe but was unsuccessful. She then took a "big portion of . . . patient charts" and left the building with them. Dr. Rolin testified that, at the time of the hearing, he still had not recovered the charts. These charts contained patient history, x-rays, and other important paperwork. He described this as a "really bad situation" for him because he had to explain to each of the patients that their personal information, including social security numbers, had been taken and have them fill out new paperwork.

Dr. Rolin testified that he never conducted a background check of the Petitioner because she was not a full-time employee. After working with her, however, he was not surprised to learn from the detective in this case that she had more than ten prior felony convictions.

On cross-examination, Dr. Rolin testified that the Petitioner had given a statement to police about her involvement in the burglary. Dr. Rolin said that insurance covered a portion of the expense he incurred as a result of the burglary but that he had to pay his deductible.

On redirect examination, Dr. Rolin explained that he believed that the Petitioner worked with another one of his employees to commit this crime. He explained that, in this burglary, the Petitioner took the approximately seventy-five files from the "C" section of his charts, which was where he kept a folder containing cash. In another incident involving another employee, the "C" section of the charts was taken. Further, the Petitioner is seen on the surveillance video looking at her phone and using her phone. The Petitioner told the detective that she was simply checking the time, but Dr. Rolin did not find this explanation credible given that one does not have to press the phone multiple times to see the time on the face of the phone. He opined that she was calling the other employee in an attempt to find a way into the office.

-4-

The Petitioner testified that she had been on probation before and did not complete it successfully. She conceded that she had also spent time in prison. The Petitioner said that she had been using crack cocaine heavily since 1998, when she was a registered dental hygienist licensed through the Board of Dentistry. The Petitioner said that all of her prior convictions involved theft or forgery offenses, which the Petitioner committed to fund her cocaine purchases.

The Petitioner said that, when she was released from prison in 2004, she pleaded before the Board of Dentistry for the reinstatement of her license. She told the board that, while incarcerated, she had taken all of the continuing education classes possible and had taken a two-year course to be certified in CPR. The board placed her on probation, requiring that she be drug tested every 90 days. The Petitioner said she complied with the probation requirements from 2004 until early 2007, working at a dentist's office and successfully not using drugs. Then, after entering an abusive relationship, the Petitioner began using drugs again. The Petitioner explained her propensity to enter poor relationships by describing the sexual abuse she suffered as a child at the hands of her uncle.

The Petitioner expressed remorse for stealing from her brother and her former employer. She apologized to them for her actions. She explained that she took the patient charts because another female employee told her that Dr. Rolin used to hide money in that area of the charts, amounts around $300 or more. The Petitioner said she never used the information contained in the charts, including social security numbers or credit card numbers.

The Petitioner agreed that she had a criminal history when she committed this crime. She described how, after she was incarcerated, a "fog" lifted from her and she looked at her life and knew that something drastic had to change. She said, on drugs, she was sick and tired all the time, living in her car, barely eating or showering. She said she had also stolen from her mother. After being placed in jail on these charges, the Petitioner said she had cooperated with police and completed drug treatment and other self-help programs. She had also participated in a program wherein she sat on a panel and told students at MTSU about her history of domestic violence. The Petitioner said she also received training in job readiness, financial planning, nutrition, and computers while in jail. She said she took as many classes as she was offered so she could "change" and learn. The Petitioner offered multiple letters written by her counselors on her behalf. She said that she did not ask for the letters but that her counselors offered them based upon the change they had seen in her.

The Petitioner acknowledged that she had a poor history of complying with probation requirements. She said that this time, however, was different. She explained that, for the first time, she was facing the "core issues" upon which her drug use was based. She said she wanted recovery because she wanted to live.

The trial court asked the Petitioner why this time was different. The Petitioner explained that she finally wanted recovery. She said doctors had told her that she had approximately eight years to live because of hepatitis liver disease. She explained that she did not want to die in prison or on drugs. She wanted to be happy for the last years of her life.

The trial court asked the Petitioner where she put the files after stealing them. The Petitioner told the trial court that she placed them in a dumpster near a motel. The trial court asked the Petitioner why she would do that knowing, as a dental hygienist, the valuable nature of such records. The trial court reminded her that if someone died they would need those records to identify the body. The Petitioner said, "I was so high, I didn't realize it."

On cross-examination, the Petitioner said she knew a woman named "Saraha" that also worked for Dr. Rolin. She denied, however, that she worked in cooperation with "Saraha" on the night that she broke into the dentist's office. She said that, on the surveillance video, she punched her phone to get her light to come on so that she could check the time. She said that she had never had any phone contact with "Saraha."

The Petitioner agreed that, as part of her plea agreement, the State dismissed charges of prescription fraud and theft. She said she was on bond for these charges when she committed the burglary and theft involved in this case.

The Petitioner's mother, Bobbie Pearson, testified that she still loved her daughter and that her daughter could live with her if released. She explained that she needed her daughter's assistance doing things around the house. She further testified that the Petitioner was different now, having addressed the issues that had caused her drug abuse. Pearson explained that part of the Petitioner's issues stemmed from the fact that Pearson did not believe the Petitioner when the Petitioner told Pearson that her uncle had sexually abused her. She said the two had worked through the Petitioner's anger about this situation.

Based upon this evidence, the trial court applied enhancement factor (1), that the Petitioner had a previous history of criminal convictions in addition to those necessary to establish her range, finding that she had sixteen felony convictions. The trial court also applied enhancement factor (8), that she had failed to comply with conditions of a sentence involving release into the community, finding that she had failed in this regard on numerous occasions. *See* T.C.A. § 40-35-114(1) & (8). In mitigation of her sentence, the trial court found that the catch-all provision number (13) applied, because the Petitioner had pled guilty and had been working hard while incarcerated. *See* T.C.A. § 40-35-113(13). The trial court noted the Petitioner's sentence range was eight to twelve years for each conviction, and it sentenced her to ten years on each conviction. It also denied her community corrections,

finding:

> She's not presumed eligible, not only because of her range, but also given all
> the times that she has violated probation. But the thing I have to look at,
> whether confinement is necessary to protect society by restraining someone
> who has a long history of criminal conduct. She falls within that category.
> And measures le[ss] restrictive than confinement have frequently or recently
> been applied unsuccessfully to the [Petitioner]. That absolutely applies in this
> case. The other one, that confinement is necessary to avoid depreciating the
> seriousness of the offense or particularly suited to provide effective deterrence
> to others, that probably doesn't apply. So two definitely apply.
>
> So the question [that] really remains is has she convinced me that I
> should take, I guess, just an absolute flying leap of faith as to whether or not
> she's going to be successful. Because she has not in the past. So do I find her
> credible on this issue? I really don't. I've listened to her. I understand that
> she's been working hard. But what that basically is because she's doing well
> while she's in the institution. She is not able to get to drugs. But based on her
> history and everything that I've heard about this case, that she is – it would not
> be in anybody's best interest, much less the [Petitioner's], to place her on
> Community Corrections. So[,] I'm denying her that.

### C. Post-Conviction Hearing

After being sentenced, the Petitioner filed a petition for post-conviction relief, alleging that she had received the ineffective assistance of counsel and that her guilty pleas were not knowingly and voluntarily entered. She alleged that Counsel was ineffective because he failed to meet with her at jail and only met with her when she appeared in court, that he failed to call Defective Alder to testify at her sentencing hearing to establish how she had assisted the police in their investigation, and that he refused to appeal her sentence because she still owed him money. She further alleged her guilty pleas were not knowingly and voluntarily entered because Counsel had told her that she would be home and "promised" her that she would receive community corrections if she entered a plea of guilty, which was the impetus for her guilty plea. Finally, the Petitioner sought a delayed appeal of her sentence.

At a hearing on her petition, the Petitioner testified that she was forty-eight at the time of the hearing and that she was incarcerated in the therapeutic community within the prison. She said she retained Counsel to represent her, paying him part of his attorney fee up front. She said that, after she was incarcerated, she was unable to make any more payments to Counsel, but her mother made a few more payments on her behalf. The Petitioner said she

felt Counsel did not have her "best interest at heart." She said he did not visit her in jail and that the two only met on her court dates. The Petitioner recalled that, on multiple occasions, Counsel was not present when she arrived for her scheduled court date.

The Petitioner testified that Counsel told her that, if she pled guilty, she would be home "after the first of the year" because she would receive community corrections. The Petitioner recalled that while she was in jail awaiting her guilty plea hearing, two community corrections officers came and spoke to her. She knew before her sentencing hearing that she had been accepted at a "halfway house" and so she was confident she would receive community corrections.

The Petitioner said that she had been on depression medicine before being incarcerated but that she had not pursued receiving her medication while incarcerated. Therefore, at the time of her guilty plea hearing, she was not taking her medicine. She said she had been diagnosed with anxiety disorders and Post-Traumatic Stress Disorder. She said she had undergone an "interferon treatment" for Hepatitis C that had "backfired." Since being incarcerated, the Petitioner had also been diagnosed with chronic obstructive pulmonary disease and hyperthyroidism. She explained that the combination of all of her diagnoses affected her mental clarity on the day she pled guilty. The Petitioner said Counsel was aware of her conditions.

The Petitioner said Counsel informed her that he would not assist her in appealing her sentence. She assumed it was because she had not paid him the balance of the money that she owed him. The Petitioner said Counsel did not inform her that she had a right to have an attorney appointed who could represent her on appeal. She filed a notice of appeal and was granted an appeal. She attempted to pursue an appeal with the assistance of the prison law clerks, but they informed her that she could not appeal her sentence because she had pled guilty. They further informed her that she must file a petition for post-conviction relief. She filed the petition for post-conviction relief and wrote Counsel two letters attempting to obtain her transcripts. After the second letter, she received a "partial" transcript. She said she wanted to appeal her sentence because Counsel had not presented to the sentencing court all of the certificates she had received while incarcerated. Further, Counsel had not presented evidence that her brother, one of the victims, had decided not to testify against her at the sentencing hearing because they had "come to terms."

On cross-examination, the Petitioner testified that she had previously been convicted of five theft felonies, ten forgeries, and evading arrest on three different occasions. During the resolution of each of those three sets of convictions, the trial judge informed her about the rights she waived as a result of entering a plea of guilty. She said she did not understand the trial court's admonitions in this case, however, because she did not "remember what all

-8-

[the trial court] asked her." The Petitioner testified that she assumed that Counsel had everything "under control," so she was not concerned when the trial court informed her that she faced between sixteen to twenty-four years in prison and that there were "no guarantees" that the trial court would grant her an alternative sentence. She said she did not tell the trial court that Counsel had told her she would receive community corrections because she placed her "trust" in Counsel. She maintained that she did not understand the "full realm" of the trial court's questions.

The Petitioner confirmed that she had met with Counsel during most of her court dates on the two convictions that are the subject of this appeal. She said she "couldn't count" the number of times she met with Counsel while at court. The Petitioner maintained that Counsel "promised" her that she would receive community corrections or get some alternative sentence. She said that Counsel told her twenty minutes before the sentencing hearing that her life was "a roll of the dice." When she asked him to explain, he said he would get back to her. This, the Petitioner said, was the first time she began to understand she may face prison time.

The Petitioner testified that she felt that, at the sentencing hearing, Counsel should have highlighted her "change of thinking" more extensively. She conceded he did this "to a small degree" but said Counsel should have called her pastor and a few other character witnesses, who would have testified that they supported the Petitioner in her request for an alternative sentence.

On redirect examination, the Petitioner identified several certificates of completion from several courses she attended while incarcerated. She agreed some of the certificates had been admitted at her sentencing hearing but said that others had been omitted.

Upon questioning by the trial court, the Petitioner agreed that the trial court had said to her during the sentencing hearing that if the plea agreement was "different than what she thought, [they] needed to clear that up today." She said she did not say anything, however, because she was "fearful" and intimidated by the trial court. The Petitioner agreed that she faced five cases on the day that she pled guilty and that the remainder of the charges against her were dropped. She agreed that the trial court told her at the time she entered her plea that, while the cases were dropped, the trial court could still consider the facts of those cases when sentencing her. The Petitioner further agreed that she filed a notice of appeal in her case and that the Court of Criminal Appeals gave her an appeal number. She later, however, voluntarily dismissed the appeal after being ill-advised that she could not appeal her sentence and could only pursue a post-conviction petition.

Counsel testified that he and the Petitioner met "a lot" until her final arrest when she

could not make bond. Further, she had so many court appearances that the two met frequently. Counsel agreed he did not visit her in jail but said that the two exchanged written correspondence. Further, they spoke over the telephone, using the Petitioner's mother's three-way phone calling capability.

Counsel said he first met the Petitioner several years before the hearing, when he represented her during a hearing on a petition to suspend her dental hygienist license. He said he also represented her during the Board of Dentistry proceeding during which her license was reinstated.

Counsel testified that the Petitioner knew "every case" she faced. He said she understood that her cases were "problematic" because she committed some of the crimes for which she was charged while on bond for other crimes. Counsel said the Petitioner understood that her sentences would have to run consecutively.

Counsel said that he successfully got the Petitioner screened for drug court. The Petitioner was accepted, but, because of her history, the State did not agree to her placement in drug court. Counsel further recalled that the State was "violently opposed" to offering the Petitioner an alternative sentence based upon the nature of the offenses and the Petitioner's prior record. Counsel said the Petitioner was aware that there was no promise that she would be granted an alternative sentence and was also aware of her sentencing range, which was between sixteen and twenty-four years.

Counsel testified that the Petitioner did not indicate that she wanted him to specifically present any evidence at the sentencing hearing. Counsel said he offered the certificates of completion he felt were pertinent to the case and called the Petitioner's mother to testify at the hearing. Counsel said the Petitioner was understandably emotional after the sentencing hearing. He said that he told her that she had a right to appeal and also informed her that he would not represent her if she appealed. While he did not have a specific recollection, he believed he told her that he would file the notice of appeal on her behalf.

On cross-examination, Counsel testified that the Petitioner met with him between two and ten times before she was arrested and placed in jail. Counsel maintained that the Petitioner did not ask that he call her pastor to testify.

Based upon this evidence, the post-conviction court dismissed the Petitioner's petition for post-conviction relief but granted her the opportunity to seek a delayed appeal of her sentence.

## II. Analysis

On appeal, the Petitioner contends that: (1) she received the ineffective assistance of counsel; (2) her guilty plea was not knowingly and voluntarily entered; and (3) the trial court erred when it sentenced her.

## A. Post-Conviction Petition

The Petitioner contends that she received the ineffective assistance of counsel and that her guilty pleas were not knowingly and voluntarily entered.

To obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The Petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's factual findings are subject to *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can only be overcome when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this court, with no presumption of correctness. *Id.* at 457.

## 1. Ineffective Assistance of Counsel

The Petitioner asserts that Counsel failed to meet with her at the jail; failed to appear for several court appearances; failed to call Detective Alder to testify at her sentencing hearing about the assistance she provided the State in their investigation; and failed to perfect her appeal in this case. The State responds that the Petitioner's claims are without merit, arguing that the Petitioner has failed to present clear and convincing evidence either that Counsel's performance was deficient or that she was prejudiced.

Both the Sixth Amendment to the United States Constitution and Article I, section 9, of the Tennessee Constitution guarantee the right of a criminally accused to representation. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

First, the [petitioner] must show that trial counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this court must determine whether the advice given or the services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). We should not deem that counsel was ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515 (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994). In the context of a guilty plea as in this case, the effective assistance of counsel is relevant only to the extent that it affects the voluntariness of the plea. Therefore, to satisfy the second prong of *Strickland*, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *see also Walton v. State*, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997).

The Petitioner asserts that Counsel failed to meet with her at the jail and that she only met with him on court dates. Further, she said that he failed to appear at two or three of these court dates. The post-conviction court found that the Petitioner had failed to demonstrate by clear and convincing evidence that Counsel was ineffective in communicating with the Petitioner. The post-conviction court noted that Counsel had testified that the Petitioner met with him several times at his office before being taken into custody and that he had also met with her at the majority of her court dates. Further, the post-conviction court accredited Counsel's testimony that he engaged in multiple three-way telephone conversations with the Petitioner and her mother. We conclude the evidence presented supports the post-conviction court's findings. Further, the Petitioner made no assertion at the post-conviction hearing and does not assert on appeal that, but for Counsel's lack of communication with her, she would have insisted on going to trial. She cannot prove, therefore, that she was prejudiced, a necessary requirement for obtaining post-conviction relief.

The Petitioner next maintains that Counsel was ineffective for failing to call Detective Alder to testify at her sentencing hearing about the assistance she provided the State in their investigation. The post-conviction court found:

> Although post-conviction counsel raised this in the amended petition, Petitioner testified that she could not recall this allegation when questioned at the evidentiary hearing. Since no evidence was presented as to this issue at the hearing, the Court finds that Petitioner has failed to establish by clear and convincing evidence that her trial counsel was deficient for not presenting this evidence at her sentencing hearing nor has she shown she was prejudiced by an alleged deficiency. The Court notes, however, that at the sentencing hearing Petitioner's trial counsel did inform the Court about her cooperating with Goodlettsville police detectives regarding the burglary of a dental clinic.

-13-

We agree with the post-conviction court that the Petitioner is not entitled to relief on this issue. She failed to present evidence, including any testimony or affidavit, from Detective Alder at the post-conviction hearing. In the absence of any such testimony, she can not prove her claim by clear and convincing evidence. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

The Petitioner finally asserts that Counsel was ineffective for failing to perfect her appeal in this case. The record indicates that the Petitioner did perfect an appeal in this case, and this Court gave her an appeal number. The Petitioner voluntarily withdrew her appeal, presumably based upon the inaccurate advice she received from the prison law clerks. The post-conviction court granted her a delayed appeal, and we will address her sentence later in this opinion. We conclude first that the Petitioner has not proven that Counsel was ineffective and also that, because she was granted a delayed appeal, she cannot prove prejudice. She is not entitled to relief on this issue.

## 2. Knowingly and Voluntarily Entered Plea

The Petitioner asserts her guilty plea was not knowing and voluntary because Counsel promised her that she would be sentenced to community corrections if she pled guilty and because she was suffering from anxiety, post-traumatic stress disorder, and depression on the day she entered her plea. The State responds that the record proves that the Petitioner understood the ramifications of her plea, including the potential sentence she could receive, and that her claims of mental trouble are not supported by the record.

When evaluating the knowing and voluntary nature of a guilty plea, the United States Supreme Court has held that "[t]he standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). The court reviewing the voluntariness of a guilty plea must look to the totality of the circumstances. *See State v. Turner*, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995); *see also Chamberlain v. State*, 815 S.W.2d 534, 542 (Tenn. Crim. App. 1990). The circumstances relevant to a guilty plea include:

> the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

*Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993) (citing *Caudill v. Jago*, 747 F.2d 1046, 1052 (6th Cir. 1984)). A plea resulting from ignorance, misunderstanding, coercion, inducement, or threats is not "voluntary." *Id.*

"Whether a guilty plea meets the constitutional standards of voluntary and knowing is a mixed question of law and fact." *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003) (citing *United States v. Gray*, 152 F.3d 816, 819 (8th Cir. 1998)). This Court reviews mixed questions of law and fact *de novo* with a presumption of correctness "given only to the post[-]conviction court's findings of fact." *Id.* (citing *Fields*, 40 S.W.3d at 458).

The post-conviction court accredited Counsel's testimony that he had discussed with the Petitioner that she faced a sentence of between sixteen and twenty-four years and that she may not receive community corrections. The post-conviction court further noted that the trial court had discussed with the Petitioner the nature and consequences of her plea, including that there was no recommended sentence, so the trial court would determine her sentence. The post-conviction court further found:

> The [trial] [c]ourt covered multiple issues with the Petitioner, including her charges and range of punishment, her prior felony convictions, the fact her sentences would have to be imposed consecutively as a matter of law, and the fact that the only alternative sentence for which she might be eligible is community corrections since her sentences are longer than ten years. Petitioner acknowledged that she understood this information. The Court explicitly informed Petitioner that "there's no guarantee" she would receive an alternative sentence and asked Petitioner if she understood, to which Petitioner responded affirmatively.

(Citations omitted).

We conclude that the evidence supports that the Petitioner's plea was knowingly and voluntarily entered. The Petitioner achieved an associates degree in college and was granted a professional license by the Board of Dentistry. She has a high degree of familiarity with criminal proceedings, having previously pled guilty to felonies on multiple occasions. She was represented by competent counsel, and she understood her option to go to trial. The State's cases against the Petitioner were strong, one case involving videotape of her committing a burglary and the other involving her signature on a pawn receipt for the items she had stolen. The trial court clearly explained the consequences of the Petitioner's plea to her during the guilty plea hearing, and the Petitioner affirmed that she understood those consequences. We conclude she is not entitled to relief on this issue.

-15-

## B. Sentence

The post-conviction court granted the Petitioner a delayed appeal of her sentence. On appeal, she contends that the trial court erred when it sentenced her because her sentence of twenty years is not "congruent with the general principles of sentencing." She states that, considering her potential for rehabilitation, she should have been sentenced to a lesser sentence or a sentence of community corrections. Finally, she asserts that her sentence is not the least severe measure necessary to achieve the purpose for which her sentence was imposed.

### 1. Length of Sentence

When a defendant challenges the length, range, or manner of service of a sentence, this Court must conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2010). As the Sentencing Commission Comments to this section note, the burden is now on the appealing party to show that the sentencing is improper. T.C.A. § 40-35-401 (2010), Sentencing Comm'n Cmts. This means that if the trial court followed the statutory sentencing procedure, made findings of facts which are adequately supported in the record, and gave due consideration to the factors and principles relevant to sentencing under the 1989 Sentencing Act, Tennessee Code Annotated section 40-35-103 (2010), we may not disturb the sentence even if a different result was preferred. *State v. Ross*, 49 S.W.3d 833, 847 (Tenn. 2001).

In conducting a *de novo* review of a sentence, we must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210(b) (2010); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). We must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103(5) (2010).

In this case, the Petitioner was convicted of two Class D felonies, and, as a Range III offender, her sentencing range was eight to twelve years for each conviction. Because the Petitioner was on bond for one of the offenses when she committed the other offense,

consecutive sentencing was mandatory. The trial court sentenced the Petitioner to the midpoint of her range, ten years, for each conviction. In so doing, it found applicable enhancement factor (1), that the Petitioner had a previous history of criminal convictions in addition to those necessary to establish her range, finding that she had sixteen felony convictions. T.C.A. § 40-35-114 (1). The court also applied enhancement factor (8), that she had failed to comply with conditions of a sentence involving release into the community, finding that she had failed in this regard on numerous occasions. T.C.A. § 40-35-114 (8). In mitigation of her sentence, the court found that the catch-all provision number (13) applied, because the Petitioner had pled guilty and had been working hard while incarcerated. T.C.A. § 40-35-113(13). We conclude that the trial court properly considered the sentencing principles when it sentenced the Petitioner. The trial court properly applied each of the respective enhancement factors and the mitigating factor. It did not err when it sentenced the Petitioner to ten years for each of her offenses. The Petitioner is not entitled to relief on this issue.

## 2. Denial of Community Corrections

The Petitioner next contends that the trial court erred when it denied her an alternative sentence of community corrections. A sentence under the Community Corrections Act is an alternative sentence. *See State v. Taylor*, 744 S.W.2d 919, 920 (Tenn. Crim. App. 1987). Thus, this Court must review an issue regarding the Community Corrections Act *de novo* pursuant to Tennessee Code Annotated section 40-35-401(d) (2010). Additionally, if the record demonstrates that the trial court properly considered relevant sentencing principles, a presumption of correctness attaches to the trial court's determination. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

When sentencing the defendant to confinement, a trial court should consider whether:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103(A)-(C) (2010).

The Tennessee Community Corrections Act was enacted in 1985. One of the purposes of the Act was "to establish a policy within the state to punish selected, nonviolent felony offenders in front-end community based alternatives to incarceration, thereby reserving secure confinement facilities for violent felony offenders." T.C.A. § 40-36-103(1) (2010); *see State v. Samuels*, 44 S.W.3d 489, 492 (Tenn. 2001). Under the Act, a court is authorized to sentence an eligible defendant, as defined in Tennessee Code Annotated section 40-36-106, to "any appropriate community-based alternative to incarceration provided in accordance with the terms of this chapter, and under such additional terms and conditions as the court may prescribe, in lieu of incarceration in a state penal institution or local jail or workhouse." T.C.A. § 40-36-106(e)(1) (2010). The program is available for:

> (A) [p]ersons who, without this option, would be incarcerated in a correctional institution;
>
> (B) [p]ersons who are convicted of property-related, or drug- or alcohol related felony offenses or other felony offenses not involving crimes against the person . . .;
>
> (C) [p]ersons who are convicted of nonviolent felony offenses;
>
> (D) [p]ersons who are convicted of felony offenses in which the use or possession of a weapon was not involved;
>
> (E) [p]ersons who do not demonstrate a present or past pattern of behavior indicating violence; [and]
>
> (F) [p]ersons who do not demonstrate a pattern of committing violent offenses . . . .

T.C.A. § 40-36-106(a)(1)(A)-(F) (2010). Those who are sentenced to incarceration or are on escape at the time of sentencing are not eligible for the program. T.C.A. § 40-36-106(a)(2) (2010). These eligibility criteria are "minimum state standards, guiding the determination of eligibility of offenders under this section." T.C .A. § 40-36-106(d) (2010). Even though a defendant might meet the minimum eligibility requirements of the Community Corrections Act, an offender is not automatically entitled to such relief. *State v. Grandberry*, 803 S.W.2d 706, 707 (Tenn. Crim. App. 1990); *see also State v. Taylor*, 774 S.W.2d 919, 920 (Tenn. Crim. App. 1987).

In this case, the trial court stated that it was denying the Defendant a community corrections sentence, finding:

She's not presumed eligible, not only because of her range, but also given all the times that she has violated probation. But the thing I have to look at, whether confinement is necessary to protect society by restraining someone who has a long history of criminal conduct. She falls within that category. And measures le[ss] restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant. That absolutely applies in this case.

The record evinces that the Petitioner was eligible for community corrections. However, her extensive history of criminal conduct, past failures at less restrictive measures than incarceration, and repeated attempts at rehabilitation followed by continued criminal behavior support the trial court's denial of a community corrections sentence. The Petitioner is not entitled to relief on this issue.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the post-conviction court's dismissal of the Petitioner's petition for post-conviction relief, and we affirm her sentence.

_____
ROBERT W. WEDEMEYER, JUDGE